FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 21 2022

TAMMY M. DOWNS, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| GABRIEL C. FUENTES, | ) | |
| | ) | MDL No. 2949 |
| Plaintiff, | ) | 4:20-md-2949 KGB |
| | ) | |
| v. | ) | Case No. 4:22-cv-58-KGB |
| | ) | |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant, | ) | This case assigned to District Judge Baker |
| | ) | and to Magistrate Judge Harris |

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Gabriel C. Fuentes, by and through his attorney George E. McLaughlin, McLaughlin Law Firm, P.C., for his Complaint against the Defendant, states and alleges as follows:

### NATURE OF ACTION

1.     Plaintiff Gabriel C. Fuentes brings this action for Gabriel C. Fuentes' personal injuries and damages relating to Defendant's development, design testing, assembling, manufacture, packaging, labeling, marketing, distribution, supplying, and/or sale to him of a defective artificial hip product known as the titanium Wright Medical Profemur Modular neck, mated with a Profemur Plasma Z Stem.

### THE PARTIES

2.     Plaintiff Gabriel C. Fuentes is a citizen of the state of Arizona, and resides in Phoenix, Maricopa County, Arizona.

3.      At all relevant times hereto Defendant Wright Medical Technology, Inc., was and is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is deemed to be a citizen of the state of Delaware and the state of Tennessee.

4.      Defendant Wright Medical Technology, Inc., at times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® hip products that are in issue in this civil action.

## JURISDICTION AND VENUE

5.      Plaintiff Gabriel C. Fuentes is a resident of Phoenix, Maricopa County, Arizona, and a citizen of the state of Arizona.

6.      Defendant Wright Medical Technology, Inc. is deemed to be a citizen of the state of Delaware and the state of Tennessee.

7.      Defendant Wright Medical Technology, Inc., distributed its products to consumers in the state of Arizona.

8.      Defendant Wright Medical Technology, Inc., is subject to the *in personam* jurisdiction of United States District Court for the District of Arizona, as it did and continues to do business within the state of Arizona, is registered with the Corporations Division of the office of the Arizona Secretary of State to do business in the state of Arizona and has a designated registered agent for the acceptance of service of process in the state of Arizona.

9.     Defendant Wright Medical Technology, Inc., is a corporation and is deemed to reside in a judicial district in which it is subject to personal jurisdiction. 28 U.S.C. §1391(c).

10.     Venue is proper in the United States District Court for the District of Arizona, pursuant to 28 U.S.C. § 1391(a) and (c), as Plaintiff resides in Maricopa County, Arizona, within the jurisdictional boundaries of that United States District Court, and a substantial part of the events giving rise to this claim occurred in Arizona.

11.     But for Case Management Order No. 1, entered on March 11, 2021, Doc. No. 56, *In Re: Profemur Hip Implant Products Liability Litigation*, MDL 2949, Case 4:20-md-02949-KGB, permitting direct filing of this civil action into the Eastern District of Arkansas, Plaintiff would have filed this civil action in the United States District Court for the District of Arizona.

12.     This United States District Court for the Eastern District of Arkansas, has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     The United States District Court for the District of Arizona also will have subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     Plaintiff respectfully requests that at the time of transfer of this civil action back to the trial court for further proceedings that this case be transferred to the United States District Court for the District of Arizona.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a), (b), (c), and (d).

## FACTUAL ALLEGATIONS

### General Allegations as to Profemur® Modular Necks

16.     In approximately the year 1985 a European manufacturer of artificial hip devices, known as Cremascoli Ortho Group ("Cremascoli"), developed the first prototype of what became known as the titanium Profemur® Modular Necks.

17.     The first prototype of what became known as the titanium Profemur® Modular Necks was patented with the European Patent Office by Cremascoli in 1986.

18.     What became known as the titanium Profemur® Modular Necks were first distributed in Europe by Cremascoli in 1986.

19.     The name PROFEMUR® was originated by Cremascoli as a brand name for certain models or designs of its artificial hip devices.

20.     Cermascoli Profemur® prosthetic hip devices are the subject of medical literature published in 1996. [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol. XXII. - Fasc. 2- GIUGNO 1996.]

21.     The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, © 2002 Wright Medical Technology, Inc., MH688-102; and, PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, © 2010 Wright Medical Technology, MH688-102, Rev. 6.10, among others.]

22.    By the end of the year 1998, the Cremascoli modular neck product line had been expanded to include "versions" of modular necks that did not exist in 1986.

23.    Based on publicly available patent documents of Cremascoli, it appears that there was a change in some aspects of the design of the titanium Profemur® modular necks before these products were first distributed in the United States.  [Hereinafter at times referred to as a "re-design".]

24.    In 1999 a "re-design" of the Profemur® Modular Necks, the design, geometry, and weight of the modular necks, compared to the necks that Cremascoli had manufactured beginning in 1985, and which Cremascoli had continued to manufacture and distribute until that design change.  In December 1999, Wright Medical Group, Inc., the parent corporation of Wright Medical Technology, Inc., purchased Cremascoli Ortho, acquiring Cremascoli's Profemur® artificial hip product line, related documents, and manufacturing facilities in Toulon France.

25.    Upon information and belief, before the acquisition of Cremascoli by Wright Medical, a re-design of the Profemur® Modular Necks at the mid-body of the neck increased the range of motion of the hip joint in an assembled artificial hip when used with compatible femoral heads and acetabular components.  [Hereinafter these re-designed Profemur® Modular Necks at times are referred to as the "PHA0" modular necks.]

26.    "Version" is the term Wright Medical used for the different lengths and angles of its Profemur® Modular Necks, identified by unique catalog numbers.  For example, the Wright Medical Profemur® titanium varus/valgus 8° long neck, catalog # PHA0-1254, was one "version" of a Wright Medical Profemur® Modular Neck.

27.     After the acquisition of Cremascoli, Wright Medical expanded the Profemur®
product line to include additional designs and "versions" of Profemur® Modular Necks that did
not exist prior to its acquisition of Cremascoli.

28.     Sometime after the acquisition of Cremascoli, Wright Medical began to refer to
some of its products as the "Profemur® Total Hip System."

29.     Before Wright Medical made its first 510(k) application for a hip device that was
called a "Profemur", the word or brand name "Profemur" was being used for the modular neck
devices that were originally designed by Cremascoli in 1985 and were being sold in Europe.

30.     On September 26, 2000, Wright Medical Technology, Inc., notified the United
States Food and Drug Administration [FDA] of its intent to market what it called the "PRO-
FEMUR R Revision Hip System" by way of what is known as an Abbreviated 510(k) Premarket
Notification.  [See: FDA 510(k) K003016.]

31.     Wright Medical's Abbreviated 510(k) Premarket Notification for the PRO-FEMUR
R Revision Hip System Device Description included, "twelve modular necks which are available
in six versions and two lengths: Neutral, anteversion/retroversion 8° or 15°, varus/valgus 8°, or
combination of anteverted/retroverted – varus/valgus (in both short and long lengths)."

32.     In the 510(k) process the FDA reviewed the submission and representations of
Wright Medical about the product and concluded that these Profemur devices were substantially
equivalent to other already legally marketed devices.

33.     In the Wright Medical 510(k) application for the Profemur R Revision Hip System,
none of the other products that Wright Medical represented to be the substantial equivalents of its

Profemur R Revision Hip System devices were a modular hip stem-neck combination that were both titanium and modular in the same neck-stem location as the Profemur devices.

34.     In its 510(k) Premarket Notification applications to distribute its titanium Profemur® Modular Necks in the United States, Wright Medical did not disclose to the FDA that there had been clinical failures in the form of fractures of the modular necks "designed by Cremascoli in 1985."

35.     The FDA did not test the safety or efficacy of the Profemur R Revision hip stem, nor the titanium Profemur® Modular Neck as a part of the 510(k) review process.

36.     On December 13, 2000, Wright Medical Technology, Inc., received clearance from the FDA to market the PRO-FEMUR R Revision Hip System in the United States.

37.     After Wright Medical filed its 510(k) Premarket Notification application to distribute its Profemur® Modular Necks in the United States, Wright Medical had a duty to report to the FDA any instances it knew of, or received notice of, a clinical failure in the form of a fracture in a patient of a modular neck that it had distributed.

38.     The FDA itself did not test in a laboratory the safety or efficacy of the Profemur® R Revision Hip System stem, nor the accompanying titanium Profemur® modular necks, as a part of the Abbreviated 510(k) process.

39.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur® Total Hip System and its components.

40.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States Wright Medical titanium Profemur® Modular Necks.

41.    On March 11, 2002, Wright Medical Technology, Inc., filed an application with the United States Patent and Trademark Office to register the trademark "PROFEMUR" in the United States. [See: U.S. Trademark Registration Number: 76380670.]

42.    The Wright Medical Profemur® Modular Necks, marketed, distributed and sold in the United States after December 13, 2000, and before August 25, 2009, for use with various Wright Medical hip stems, were manufactured in various models or styles, six of those were identified by Wright Medical as "short" necks (i.e., Ref. #s PHA0-1202, PHA0-1212, PHA0-1222, PHA0-1232, PHA0-1242, and PHA0-1252), and six were identified by Wright as "long" necks (i.e., Ref. #s PHA0-1204, PHA0-1214, PHA0-1224, PHA0-1234, PHA0-1244, and PHA0-1254).

43.    Sometime after December 13, 2000, Wright Medical began to import, manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur R Revision Hip System, including the titanium Profemur® Modular Necks.

44.    The Wright Medical Profemur® Modular Necks that were distributed in the United States after December 13, 2000, and before August 25, 2009, were all made of a titanium-aluminum-vanadium alloy known as Ti6A14V.

45.    After December 13, 2000, Wright Medical applied for and received FDA 510(k) clearance for various other models or designs of Profemur Hip Stems.

46.     In April of 2002, Wright Medical applied for a 510(k) clearance to distribute in the United States what it called the STEM Hip Replacement System, to be used with its titanium Profemur® Modular Necks that had previously been cleared for distribution in the United States.

47.     In the Wright Medical 510(k) application for the STEM Hip Replacement System, the only other artificial hip stem product that Wright Medical represented to be the substantial equivalent of the STEM Hip Replacement System that was modular at the neck-stem junction was its own Profemur R Hip Revision System.

48.     At the time Wright Medical applied for a 510(k) clearance to distribute in the United States the STEM Hip Replacement System, the Profemur R Hip System had been distributed in the United States for less than four months.

49.     On July 2, 2002, the FDA granted Wright Medical's application for a 510(k) clearance to distribute in the United States the STEM Hip Replacement System with its titanium Profemur® Modular Necks.

50.     The FDA clearance that Wright Medical received for its STEM Hip Replacement System is known and identified as K021346.

51.     Wright Medical subsequently renamed or rebranded the STEM Hip Replacement System as the Profemur Z hip stem.

52.     Over time Wright Medical expanded the Profemur® prosthetic hip stem product line to include additional designs of Profemur® Stems, including hip stems branded with names such as the Profemur® Z Hip Stem, Profemur® Plasma Z Hip Stem, Profemur® LX Hip Stem, and the Profemur® TL Hip Stem, among others.

53.     The Profemur Z hip stem as cleared by the FDA for distribution in the United States on July 2, 2002, was not a plasma coated hip stem.

54.     Wright Medical designed and manufactured a plasma coated Profemur Z hip stem, which it branded as the Profemur Z Plasma hip stem, and/or the Profemur Plasma Z hip stem.

55.     Wright Medical has never received a 510(k) clearance from the FDA to distribute in the United States the Profemur Plasma Z hip stem for use with titanium Profemur® Modular Necks.

56.     After January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, in printed brochures that it created, copywrote, and distributed, known as "Technical Monographs."

57.     After January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, on and through internet website pages that it created, copywrote, and controlled.

58.     After January 13, 2000, Defendant Wright Medical began to market its Profemur® hip devices to the general public, on and through internet website pages that it created, copywrote, and controlled.

59.     In Technical Monographs material created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck used with the Profemur® Hip has been employed by Wright Cremascoli for over 15 years. The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides

the Profemur® Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

60.     The modular necks which Wright Medical represented in literature distributed in the United States at its first marketing of these devices as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," were the original modular neck design of Cremascoli that existed prior to the 1999 re-design.

61.     The modular necks which Wright Medical represented in literature distributed in the United States at its first marketing of these devices as having been "designed by Cremascoli in 1985," and represented that "none of the necks has experienced a clinical failure since their inception," were the original modular neck design that existed prior to the 1999 re-design.

62.     Prior to the year 2002, Cremascoli received notice of clinical failures [i.e., failures in patients] in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

63.     Prior to the year 2002 Wright Cremascoli Ortho received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

64.     Prior to the year 2002 Wright Medical received notice of clinical failures in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

65.     In the years 2003 and 2004, Wright Cremascoli Ortho received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

66.     In the years 2003 and 2004, Wright Medical received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

67.     Wright Medical knew that the above quoted statement by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," was false when first made.

68.     Prior to December 1, 2008, Wright Medical never corrected or recanted the above quoted statement by Wright Medical, "None of the necks has experienced a clinical failure since their inception."

69.     In various Technical Monographs created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

70.     The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made.

71.     Wright Medical has never corrected or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

72.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and

claims about its Conserve® and Profemur® hip product lines that these products were intended for patients who wanted to return to an "active lifestyle."

73.    In marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, skydiving and heavy labor.

74.    In marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products had been implanted in patients who had returned to or engaged in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, skydiving and heavy labor.

75.    Patient Testimonials, also at times called "Patient Stories," that have appeared on the Wright Medical website, and were available to Wright Medical sales representatives, distributors, physicians, patients, and the public in and after the year 2004, and/or that appeared in printed materials published by Wright Medical from 2004 into the year 2012, represented patients who received Wright Medical artificial hips have already returned or are about to return to such activities as running, jogging, snow skiing, water skiing, marathon running, tennis, racquetball,

golf, horseback riding, work that involves lifting and moving of heavy objects, active military duty in Iraq, karate, competitive wrestling, skydiving, and competitive motocross racing, among other activities.

76.     Some of the Patient Testimonials [a/k/a Patient Stories] that have from time to time appeared on the Wright Medical Website, and in printed materials published by Wright Medical from 2002 into the year 2012, have been from men weighing more than 250 lbs. who had received a titanium Profemur® Modular Neck.

77.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were expected to last 10 to 15 years.

78.     In marketing its Conserve® and Profemur® hip product lines to surgeons, one or more Wright Medical sales representatives made representations to one or more surgeons that Wright Medical Conserve® and Profemur® hip products were expected to last at least 20 years.

79.     In publications copywritten in the year 2002, that Wright Medical distributed for its marketing of its Profemur hip devices, it stated its Profemur® Modular Necks as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," a time frame and number of implants that included the original modular neck design that existed prior to the 1999 re-designed [PHA0] modular necks.

80.     Prior to the year 2000, Cremascoli had received notice of clinical failures in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

81.     Prior to the year 2000, Wright Medical had received notice of clinical failures in the form of fractures in Europe of the modular necks that had been "designed by Cremascoli in 1985."

82.     Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur® modular necks in the United States, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

83.     Once Wright Medical received clearance to distribute titanium Profemur® modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

84.     Prior to 2004, Wright Medical knew of or received notice of fractures in patients of Profemur® modular necks that had been "designed by Cremascoli in 1985".

85.     Prior to April 19, 2005, Wright Medical did not report to the FDA any of the events it received notice of that a Profemur® modular neck had fractured in a patient.

86.     On or about April 19, 2005, Wright Medical first reported to the FDA that it had received notice that a Profemur® modular neck implanted in a patient had fractured.

87.     After receiving notice of a 2005 Profemur® modular neck fracture, Wright Medical received notice of additional Profemur® modular neck fractures in patients.

88.     After receiving notice of the January 2005 Profemur® Modular Neck fracture in Europe, Wright Medical received notice of additional Profemur® Modular Neck clinical failures in Europe, Canada, and the United States, where the modular neck implanted in a patient had fractured at its oblong taper, where the oblong taper seats in the pocket of the stem.

89.     The number of reported titanium Profemur® modular neck fractures have continued to increase each year since fractures were first reported.

90.     Through March 31, 2018, there have been 768 Profemur® Modular Neck fractures. [11/06/2018 Transcript, pg. 13, U.S.D.C., Colorado, *Applekamp v. Wright Medical*, Case No. 17-cv-01601.]  Since that date additional Profemur® Modular Neck fractures have occurred.

91.     Prior to December 1, 2008, Wright Medical did not inform all orthopedic surgeons in the United States known by it to have implanted its titanium Profemur® modular necks of the reports it had received of titanium modular necks fracturing.

92.     Prior to December 1, 2008, Wright Medical did not inform Plaintiff's orthopedic surgeon, Theodore P. Firestone, M.D., that it had received notice of titanium modular necks fracturing.

93.     On December 1, 2008, a "Safety Alert" was sent by Wright Medical to certain "medical professionals," which stated, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008.  Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

94.     At the time Wright sent its December 1, 2008, Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of a Profemur® modular neck) as of November 21, 2008, if all of the modular neck fractures back to the year 1985 that had been reported to Cremascoli and to Wright Medical were included in the total.

95.     In the FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its Abbreviated 510(k)

clearance application for the Pro-Femur R Revision Hip System, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

96.     In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur® hip devices distributed in the United States from the date of their introduction into the United States, through June of 2009, Wright stated the use of these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."

97.     Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur® hip devices include a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who weighed more than a specifically stated patient body weight.

98.     In its IFUs for the Profemur® hip devices Wright Medical has never included a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who had a body mass index [BMI] at or above a certain number.

99.     Wright Medical has never stated in its IFUs for the Profemur® hip devices that the use of any of its Profemur® modular necks was contraindicated in heavyweight males.

100.     Wright Medical has never stated in its IFUs for the Profemur® devices that the use of any of its Profemur® modular necks was contraindicated in patients who engaged in heavy lifting.

101.     Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

102.   The IFU for Wright Medical Profemur® devices distributed in the United States was the same IFU document used for some other Wright Medical hip stem devices that did not use Profemur® Modular necks and were not modular in the region of the artificial femoral neck.

103.   At no time did Wright Medical state in its IFUs that the rate of failure by fracture of the implant was higher for its Profemur® modular neck hip devices, compared to the rate of failure by fracture for other Wright Medical stem hip devices that did not use modular necks, but were subject to the same IFU document.

104.   Even though some Wright Medical IFUs for the Profemur® devices in use prior to August 2010 contained a section titled, "Conditions presenting increased risk of failure include. . . ," that section of the IFU did not state that patients who weigh more than a certain patient body weight, or have a BMI at or above a certain number, or engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component, when compared to the risk of failure for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

105.   Even though some Wright IFUs for the Profemur® devices in use prior to August 2010 contained a section titled "Warning," and a subsection within titled "Modular Necks," Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI at or above certain number, or who engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

106.    Even though some Wright IFUs for the Profemur® hip devices in use prior to August 2010 contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

107.    Prior to August 2010 Wright Medical did not change the language in its IFUs for its Profemur® devices to address the issue of any specific patient body weight or activity levels related to the potential for a modular neck fracture.

108.    Between the dates of December 13, 2000, and August 25, 2009, all of the Profemur® modular necks distributed by Wright Medical were made of a titanium alloy, generally known as Ti6Al4V.

109.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its titanium Profemur® modular necks having fractured at the oblong taper (distal end) where it is seated in the "pocket" of the stem.

110.    Prior to July 30, 2010, Wright Medical came to the conclusion that, "Higher than normal rates of early failure of the long offset PROFEMUR® Titanium Modular Necks have been observed for heavyweight (>230 lbs.) patients."

111.   Prior to July 30, 2010, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur® modular necks.

112.   Wright Medical titanium Profemur® Modular Necks fractured at the neck-stem junction because they were:

      a.    Inadequately designed for the patient population for which they were marketed;

      b.    Not designed to withstand the stress and loads that they would reasonably be expected to be subjected to after implantation;

      c.    Not designed to meet the performance requirements of published applicable industry standards; and,

      d.    Not designed with the performance characteristics that had been represented to surgeons by Wright Medical, and its sales force.

113.   As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, surgeons who had been implanting these devices began to question the safety of these devices.

114.   After Wright Medical sent the December 1, 2008, "Safety Alert" informing surgeons of Profemur® Modular Neck fractures, some surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

115.   After Wright Medical sent the December 1, 2008, "Safety Alert" informing surgeons of Profemur® Modular Neck fractures, sales of its Profemur® hip devices in the United States began to decline.

116.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge to surgeons or to the FDA that titanium Profemur® modular neck fractures were a result of a defective design.

117.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge to surgeons or to the FDA that titanium Profemur® modular neck fractures that were occurring were a result of an inadequate design for the intended patient population in which that they had been marketed to surgeons as appropriate for.

118.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical engaged in a campaign of concealment, misinformation, deceit, and fraud, misrepresenting to surgeons the facts and truth as to the numbers, rates, and reasons for its Profemur® modular neck fractures.

119.    As the number of reported Wright Medical titanium Profemur® Modular Neck fractures continued to increase, Wright Medical did not inform all surgeons using these products the fracture rates or fracture numbers associated with each of the various versions of its Profemur® Modular Necks.

120.    As the number of reported Wright Medical titanium Profemur® Modular Neck fractures continued to increase, Wright Medical did not inform the Plaintiff's surgeon which versions of is Profemur® Modular Necks had the highest numbers of fractures, and the highest rate of fractures, of these Modular Necks.

## PLAINTIFF GABRIEL C. FUENTES' PROFEMUR HIP

121.     In 2004 Plaintiff Gabriel C. Fuentes had a Wright Medical artificial hip implanted in the left side of his body in a procedure known as a total hip arthroplasty (THA).

122.     The surgeon who implanted Plaintiff's Wright Medical artificial hip was Theodore P. Firestone, M.D.

123.     Plaintiff's left hip implant surgery was performed at Scottsdale Healthcare Shea Medical Center, Scottsdale, Arizona.

124.     At the time of the implantation of Plaintiff's Wright Medical artificial hip, Wright Medical was on notice of fractures of its titanium Profemur® Modular Necks having occurred in Europe.

125.     At the time of the implantation of Plaintiff's Wright Medical artificial hip, Wright Medical did not inform Plaintiff's surgeon that it had knowledge of prior fractures of its titanium Profemur® Modular Necks.

126.     At the time of the implantation of Plaintiff's Wright Medical artificial hip, the local distributor of Wright Medical hip products did not inform Plaintiff's surgeon that it had knowledge of prior fractures of its titanium Profemur® Modular Necks.

127.     Theodore P. Firestone, M.D., did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

            a.      In the care or treatment that he provided to Plaintiff Gabriel C. Fuentes prior to beginning Mr. Fuentes' hip implant surgery;

b.      In the information that he did or did not provide Plaintiff Gabriel C. Fuentes prior to beginning Mr. Fuentes' hip implant surgery;

c.      In the selection of the Wight Medical Profemur Hip System, or any of its components, that were implanted in Plaintiff Gabriel C. Fuentes;

d.      In the hip implant surgery, he performed on Plaintiff Gabriel C. Fuentes;

e.      In the care or treatment that he provided to Plaintiff Gabriel C. Fuentes, subsequent to Mr. Fuentes' hip implant surgery; and,

f.      In the information that he did or did not provide to Plaintiff Gabriel C. Fuentes subsequent to Mr. Fuentes' hip implant surgery.

128.    Based upon the patient population that Wright Medical intended its artificial hip systems to be implanted in, at the time of implantation with his Wright Medical hip, Plaintiff Gabriel C. Fuentes was an appropriate patient to be implanted with the Wright Medical hip products he received.

129.    Plaintiff's surgeon, Theodore P. Firestone, M.D., recommended the Wright Medical Profemur® Hip System to Plaintiff Gabriel C. Fuentes and indicated that the Wright Medical Profemur® Hip System implant was an appropriate implant for him.

130.    Plaintiff Gabriel C. Fuentes reasonably relied upon the statements of Theodore P. Firestone, M.D., in deciding to proceed with hip replacement surgery and have Wright Medical Profemur® Hip Systems implanted in him.

131.    "Patient Testimonials" and "Patient Stories" published by Wright Medical on Wright Medical's internet website prior to and up to November of 2009, promoting Wright

Medical's hips, demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur hips.

132.   The paid endorsements of professional tennis player Jimmy Connors, published by Wright Medical on a website it created and maintained, www.Jimmysnewhip.com, and other digital and printed materials promoting Wright Medical hips by Jimmy Connors, demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur hips.

133.   Plaintiff's surgeon, Theodore P. Firestone, M.D., relied upon the representations of Wright Medical contained in the above referenced Technical Monographs [e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004], quoted in Paragraphs 66 and 76, above, or substantial statements contained similar publications, as well as substantially similar statements that were made to him by Wright Medical employees and officers, including, but not limited to, Patrick Fisher and the company President and CEO, Gary Henley, in deciding to use the Wright Medical Profemur Hip System in Plaintiff.

134.   In his total hip replacement surgery 2004, Plaintiff Gabriel C. Fuentes had implanted in his left hip the following specific Wright Medical devices and components:

   a.   Wright Cremascoli Profemur® Z Stem [Plasma Z]

   b.   Wright Cremascoli Profemur® Modular Neck
         Material: Ti6Al4V

   c.   Lineage® Ceramic Femoral Head

   d.   Dynasty™ PC Shell

   e.   Dynasty™ Polyethylene Liner

135.    At the time of the implantation of Plaintiff's Wright Medical artificial hip, Wright Medical was on notice of fractures of its titanium Profemur® Modular Necks that had been designed in 1985 and employed by Wright Cremascoli for over 15 years.

136.    At no time prior to this surgery was Dr. Firestone told that the Wright Medical Profemur® Z Plasma Stem that was delivered to him for implantation had not been cleared by the FDA for use with a Wright Cremascoli Ortho titanium Profemur® Modular Neck.

137.    Based upon the patient population that Defendant Wright Medical intended its Profemur Hip Systems to be implanted in, and when Plaintiff Gabriel C. Fuentes had the devices implanted in him, he was an appropriate patient to be implanted with these Wright Medical products.

138.    Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff Gabriel C. Fuentes used his Wright Medical artificial hip in a normal and expected manner.

139.    Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff Gabriel C. Fuentes used his Wright Medical artificial hip in a manner consistent with many of the representations made in "Patient Testimonials" and "Patient Stories" that appeared in the Wright Medical web site.

140.    On February 5, 2020, the titanium Profemur® Modular Neck component of Plaintiff Gabriel C. Fuentes' Profemur left hip suddenly and catastrophically structurally failed, breaking into two pieces at the oblong taper or distal end of the device, where it seated in the pocket of the Profemur stem.

141.    At the time of this catastrophic failure, Plaintiff Gabriel C. Fuentes was performing a normal and expected activity of his daily living.

142.   The structural failure of the titanium Profemur® Modular Neck component of Plaintiff's artificial hip was the result of a fatigue failure of the titanium, caused over time by cyclic loading of the device, until more than 90% of the distal end oblong taper had fractured through its cross section, and the remaining connected metal then suffered a tensile failure, resulting in a complete fracture of the modular neck.

143.   Because of the fracture of the Plaintiff Gabriel C. Fuentes' fractured Profemur Modular neck it was necessary for him to have emergency surgery performed to remove the failed device.

144.   On February 7, 2020, orthopedic surgeon Perry J. Evangelista, M.D., performed upon Plaintiff Gabriel Fuentes' left hip a revision hip surgery at HonorHealth Scottsdale Osborn Medical Center, 7400 E. Osborn Road, Scottsdale Arizona 85251-6432.

145.   Dr. Evangelista's revision surgery included the removal from Plaintiff Gabriel C. Fuentes, the Wright Medical Conserve femoral head that was connected to the proximal remnant of the fractured titanium Profemur® Modular Neck and an extended trochanteric osteotomy to remove that otherwise well-fixed Profemur Plasma Z stem.

146.   With the exception of the fact that the titanium modular neck had fractured, at the time of its catastrophic failure on February 5, 2020, Plaintiff's Profemur hip, including the Profemur® Modular Neck and Profemur stem, were in substantially the same condition in all relevant respects as when they left Wright Medical's control.

147.   With the exception of the fact that the titanium modular neck of Plaintiff's artificial hip had fractured, at the time of its catastrophic failure on February 5, 2020, Plaintiff's Profemur hip was not otherwise in need of hip revision surgery.

148.    With the exception of the fact that the titanium modular neck of Plaintiff's artificial hip had fractured, at the time of its catastrophic failure on February 5, 2020, Plaintiff's Profemur hip stem system was reasonably expected to have lasted for the remainder of his life without suffering a fracture of the Profemur hip system.

## ALLEGATIONS OF DEFECTIVE PRODUCT

149.    The titanium Profemur® Modular Neck is designed in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction.

150.    The titanium Profemur® Modular Neck is manufactured in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck, at or near the neck-stem junction.

151.    The titanium Profemur® Modular Neck is designed in a way that after implantation in a patient it is subject to structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction as a result of being subjected to the normal and expected activities of daily living.

152.    The Profemur Hip System in general, and the titanium Profemur® Modular Neck implanted in Plaintiff Gabriel C. Fuentes, was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

        a.    It was and is unreasonably dangerous under Arizona product liability law as a result of one or more of a combination of the following:

(1)     the Profemur Hip System was designed in such a way that the point of highest stress on the modular neck is at the neck-stem junction;

(2)     the Profemur Hip System was designed in such a way that the modular neck was subject to micromotion and fretting corrosion at its point of highest stress, thereby increasing the potential for failure by fatigue fracture;

(3)     the surface of the section of the neck that was inserted into the femoral stem was designed in such a manner as to increase the potential for fretting and corrosion and failure;

(4)     the portion of the neck that was inserted in the femoral stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion and failure;

(5)     the components were designed in such a way as to make the modular neck component more susceptible to fretting and corrosion than other existing alternative products, thereby increasing the potential for failure;

(6)     the components were designed in such a way as to make the modular neck component more susceptible to fatigue failure and fractures than other existing alternative products;

(7)     the risk of neck fracture outweighed the utility of the device, considering other technically feasible alternatives, and other already existing alternative products;

(8)     a reasonably prudent manufacturer or seller, given knowledge of the product's condition, would not have marketed or sold the product; and,

(9)     there may be other conditions or defects yet to be determined.

b.     It was unreasonably dangerous in that it failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonable, foreseeable manner and thereby unreasonably dangerous to an extent beyond which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics, in that:

(1)     the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the catastrophic structural failure of the titanium modular neck;

(2)     the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical intended; and,

(3)     the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical posted on its website as "Patient Testimonials" and "Patient Stories".

153.     The titanium Profemur® Modular Neck is not designed to withstand the normal activities of daily living after implantation without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

154.     The titanium Profemur® Modular Neck is not designed to withstand the normal activities of daily living after implantation in "heavyweight" patients, as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

155.     The titanium Profemur® Modular Neck is not designed to withstand the activities of "high impact sports," as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

156.     The titanium Profemur® Modular Neck is not designed to withstand the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright Medical defined and used those terms, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

157.     The titanium Profemur® Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was intended for, without catastrophic structural failure of the titanium Modular neck from a fatigue fracture during the expected useful life of that component.

158.     The titanium Profemur® Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient

population that the product was marketed for, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

159.   The titanium Profemur® Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, for some of the people who appeared on Wright Medical's web site "Patient Testimonials" and "Patient Stories" web pages.

160.   The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, and that were expected would be encountered in the activities of daily living of Jimmy Connors, a professional tennis player, who, after his hip replacement surgery, was compensated by Wright Medical to be a spokesperson on behalf of Wright Medical artificial hip products.

161.   The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Ramon Garcia, who, after his hip replacement surgery, provided a "Patient Testimonial" on behalf of Wright Medical, that shows him jumping from the side of his pick-up truck.

162.   The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities

of daily living of Roger Klein, who, eight weeks after hip replacement surgery returned to work "lifting and moving heavy objects," and who, after his hip replacement surgery, provided a "Patient Testimonial" on behalf of Wright Medical.

163.    The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Evelyn, a marathon runner and dirt bike rider, who, after her hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical, and appeared on the cover of the Wright Medical Group, Inc., 2010 Annual Report, sitting on a dirt bike.

164.    The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Lawrence (a/k/a "Larry"), who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

165.    The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Kevin, who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

166.    The titanium Profemur® Modular Neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during

the expected useful life of that component, that were known would be encountered in the activities of daily living of the Plaintiff in this case.

167.   Wright Medical marketed and promoted its Conserve® and Profemur® artificial hips as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff Gabriel C. Fuentes in choosing to have artificial hip surgery.

168.   The titanium Profemur® Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the activities of living in the patient population that Wright Medical marketed these devices for use in.

169.   The titanium Profemur® Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the normal activities of daily living of "heavyweight" patients, as Wright Medical defined and used that term.

170.   The titanium Profemur® Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients who engaged in "high impact sports," as Wright defined and used that term.

171.   The titanium Profemur® Modular Neck was not tested in design and at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

172.   The titanium Profemur® Modular Neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the

activities of daily living of the patient population that Wright Medical intended to market these devices for use in.

173.   The titanium Profemur® Modular Neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the normal activities of daily living of active patients, as Wright Medical defined and used that term.

174.   The titanium Profemur® Modular Neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients who engaged in "high impact sports," as Wright defined and used that term.

175.   The titanium Profemur® Modular Neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

176.   The titanium Profemur® Modular Neck was not tested for the FDA section 510(k) Premarket Notification Process at the forces equal to the level of activities of patients that Wright Medical subsequently marketed these devices for use in.

177.   On September 18, 2020 a Class 1 Device Recall of Profemur® Long Titanium modular necks was posted by the United States Food and Drug Administration [see: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=182849 ].

178.   Included in the Manufacturer Reason for Recall was this statement:

[T]here have been reports of fractures of the long and extra-long Titanium modular femoral neck component after implantation. Worldwide there were 680 Long and X-Long PROFEMUR Titanium modular neck fractures among 123,840 global sales representing is a cumulative rate of modular neck device fracture of 0.55% from 2002 to 2019. Within the United States there were 349 Long and X-Long PROFEMUR Titanium modular neck fractures among 15,786 United States sales

representing a cumulative rate of modular neck device fracture with a fracture rate in the United States of 2.21% from 2002 to 2019. There is an average time of 5.4 years to device fracture after implantation.

## ALLEGATIONS OF WRIGHT MEDICAL CONDUCT

### Ti Profemur® Modular Necks and the Profemur® Hip System

179.    Wright Medical marketed the Ti Profemur® Modular Neck as a part of the PROFEMUR® Modular Hip System, which had been designed in 1985.

180.    The products, documents, and records that existed at and within Cremascoli Ortho Group were acquired by Wright Medical when it acquired Cremascoli Ortho on December 22, 1999.

181.    On December 22, 1999, the Ti Profemur® Modular Neck was known by Cremascoli Ortho to have sustained structural failures by fractures of the modular neck.

182.    By the date of December 22, 1999, Cremascoli Ortho knew of fractures of its Ti Profemur® Modular Necks which had occurred prior to that date.

183.    By the date of December 22, 1999, Cremascoli Ortho knew of fractures of its Ti Profemur® Modular Necks which had occurred due to micromotion and fretting corrosion.

184.    By the date of the first 510(k) application for a Profemur product by Wright Medical, there had been fractures of Ti Profemur® Modular Necks known to Wright Medical to have occurred in Europe prior to September 26, 2000.

185.    By the date of the first 510(k) application for a Profemur product by Wright Medical, there had been fractures in of Ti Profemur® Modular Necks known to Wright Medical to have occurred in Europe prior to September 26, 2000, as a result of micromotion and fretting corrosion.

186.    Between the year 1985 and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures in Europe of Ti Profemur® Modular Necks known to Cremascoli Ortho.

187.    Between the year 1985 and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures in Europe of Ti Profemur® Modular Necks known to Cremascoli Ortho as a result of micromotion and fretting corrosion.

188.    Between January 1, 2000, and September 26, 2000, (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures in Europe of Ti Profemur® Modular Necks known to Wright Cremascoli Ortho.

189.    Between January 1, 2000, and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures in Europe of Ti Profemur® Modular Necks known to Wright Cremascoli Ortho as a result of micromotion and fretting corrosion.

190.    Surgeons, as the "learned intermediary" who selected and implanted these devices, had a right to know that fractures of Wright Medical Ti Profemur® Modular Necks had occurred, so that they could consider that information in deciding whether or not to choose these devices for implantation in a particular patient.

191.    Prior to 2004 fractures of Ti Profemur® Modular Necks had occurred.

192.    Prior to 2004 Wright Medical did not inform Plaintiff's surgeon, Dr. Firestone, that any fractures of its Ti Profemur® Modular Necks had occurred.

193.    Prior to 2004 the local distributor of Wright Medical hip products did not inform Plaintiff's surgeon, Dr. Firestone, that any fractures of its Ti Profemur® Modular Necks had occurred.

194.    Prior to the implant of the Ti Profemur® Modular Neck in Plaintiff in 2004 Wright Medical did not warn patients, surgeons, hospitals, customers, or its local distributors and field representatives, that the neck component of these devices was known to be failing from structural failure by fracture of the modular neck.

195.    Prior to December 1, 2008, Wright Medical did not inform all surgeons, as the "learned intermediary" who selected and implanted these devices, that fractures of Wright Medical Ti Profemur® Modular Necks had occurred.

196.    The Ti Profemur® Modular Neck was known by Wright Medical to be failing at "higher than normal rates of early failure," as Wright Medical defined and used that term, from structural failure by fracture of the modular neck, prior to February 5, 2020, the date it fractured in Plaintiff Gabriel C. Fuentes.

197.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn patients that the Ti Profemur® Modular Neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck during normal activities of daily living.

198.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn patients that the Ti Profemur® Modular Neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck in high activity patients.

199.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn patients that the Ti Profemur® Modular Neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who weighed less than 225 lbs.

200.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn surgeons that the Ti Profemur® Modular Neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck during normal activities of daily living.

201.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn surgeons that the Ti Profemur® Modular Neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who had not engaged in high levels of activity.

202.    Prior to February 5, 2020, the date of the fracture of Plaintiff's Profemur® Modular Neck, Wright Medical did not warn surgeons that the Ti Profemur® Modular Neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who weighed less than 225 lbs.

203.    The Ti Profemur® Modular Neck is of a design that it may suddenly and catastrophically fail when being used in accordance with the levels of activity and use by the patient population that it was marketed for by Wright Medical.

204.    The Ti Profemur® Modular Neck is of a design that it may structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure.

205.    The Ti Profemur® Modular Neck is of a design that it will structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure, when being used in reasonable and foreseeable ways.

206.    The Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck was marketed by Wright Medical and the sales and marketing representatives Wright Medical trained, for uses and durability that exceeded its design and its structural limitations known to Wright Medical.

207.    The Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck was marketed by Wright Medical and their trained representatives for uses and durability that exceeded their design, capabilities, and limitations as stated in the IFUs that Wright Medical published for these devices.

208.    Prior to 2004 Wright Medical knew or should have known that the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck would fail from structural failure of the necks at a rate higher than the structural failure rate of the neck on stems of other comparable artificial hip systems readily available on the market that did not employ a modular neck design.

209.    Prior to 2004 Wright Medical knew or should have known that the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck would fail from structural failure of the modular necks at a rate higher than the structural failure rate of other comparable modular stem artificial hip systems readily available on the market that did not have a modular junction at the point where the neck joins the femoral stem.

210.    Prior to 2004 Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that the femoral necks of its Profemur Hip

System were fracturing at a rate higher than other comparable artificial hip systems readily on the market that did not employ a Ti Profemur® Modular Neck design at the point of the femoral neck-stem junction.

211.    Prior to 2004 Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that higher patient weight, and higher levels of patient activity, placed a patient at a higher risk of the Ti Profemur® Modular Neck structurally failing by fracture.

212.    The Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck is designed, manufactured, labeled, marketed, and promoted in such a way that it fails by the modular neck structurally failing [i.e., fractures] in substantially less time than is expected with other comparable devices readily available on the market.

213.    The Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck is designed, manufactured, labeled, marketed, and promoted in such a way that it has a substantially higher rate of structure failure [i.e., modular neck fracture] than other comparable devices readily available on the market.

214.    After Wright Medical received notice that the Ti Profemur® Modular Necks were failing from structural failure of the neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not timely disclose that information to patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained.

215.    After Wright Medical received notice that the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck was failing from the structural failure by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip

systems, Wright Medical continued to market, distribute, and sell these devices to hospitals, surgeons, patients and other customers and consumers.

216. After Wright Medical received notice that the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck was failing from structure failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not provide post-sale warnings to patients who had these devices implanted that included the following information:

    a.    The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

    b.    If the modular neck of their hip did suddenly and catastrophically fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

    c.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

    d.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

    e.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

f.      These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

g.      In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . .. Alternative devices, such as Cobalt Chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

h.      Wright stopped distribution of all of its Ti Profemur® Modular Necks in the United States because of the unacceptably high structural failure rate.

217.    After Wright Medical received notice that the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck was failing from structural failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not request surgeons who implanted these devices to provide, at Wright Medical's expense, post-sale warnings to patients who had these devices implanted that included the following information:

a.      The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

b.      If the modular neck of their hip did suddenly and catastrophically structurally fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were,

and what they were doing, at the time of the failure, they could suffer serious injury or death;

c.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

d.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

e.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

f.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

g.    In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . .. Alternative devices, such as cobalt chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

h.    Wright stopped distribution of all Ti Profemur® Modular Necks in the United States because of the higher than expected structural failure rate of that component.

## ACCRUAL OF THIS CAUSE OF ACTION

218.    Prior to February 5, 2020, Plaintiff Gabriel C. Fuentes had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted titanium Profemur® Modular Neck.

219.    Prior to February 5, 2020, Plaintiff Gabriel C. Fuentes had neither knowledge nor notice that he had suffered any injury because of any actions or inactions, errors, or omissions, by Wright Medical.

220.    It was not until February 5, 2020, Plaintiff Gabriel C. Fuentes first had any notice or knowledge that his injuries and/or that the failure of the titanium Profemur® Modular Neck implanted in his left hip was the result of any defects in the design, manufacture, warning or labeling of his implanted Profemur® Modular Neck or Profemur Hip System.

221.    Prior to February 5, 2020, Plaintiff Gabriel C. Fuentes did not know, and could not have known by the exercise of reasonable diligence, that his left hip had been injured.

222.    Prior to February 5, 2020, Plaintiff Gabriel C. Fuentes did not know and could not have known by the exercise of reasonable diligence, of any cause of any injury to his left hip.

223.    Prior to February 5, 2020, Plaintiff Gabriel C. Fuentes had no reason to know or suspect that the hip implanted in his left hip was defective or is in the process of structurally failing due to a fatigue fracture.

224.    Plaintiff Gabriel C. Fuentes' cause of action, as alleged in this Complaint against Defendant Wright Medical did not accrue until February 5, 2020.

## PLAINTIFF'S INJURIES AND DAMAGES

225.    On or about February 5, 2020, the Profemur Hip System implanted in Plaintiff Gabriel C. Fuentes' left hip catastrophically failed, i.e., it structurally failed by fracture at the oblong taper where it is seated in the pocket of the femoral stem, as a result of one or more or a combination of the unreasonably dangerous conditions, acts of negligence, negligent failure to act, and misrepresentations of Defendant Wright Medical, as set forth in detail in this Complaint.

226.    As a direct and proximate result of the failure of Plaintiff's Profemur Hip System, Plaintiff Gabriel C. Fuentes has sustained injuries and damages including, but not limited to:

a.    undergoing a revision hip surgery to remove and replace the failed devices;

b.    undergoing a second revision hip surgery;

c.    past and future pain and anguish, both in mind and in body;

d.    permanent diminishment of his ability to participate in and enjoy the affairs of life;

e.    medical bills associated with the hip replacement procedures and recovery therefrom;

f.    future medical expenses;

g.    loss of enjoyment of life;

h.    loss of past and future income and earning capacity;

i.    disfigurement; and,

j.    permanent physical impairment.

## CAUSES OF ACTION

## COUNT I

## STRICT LIABILITY OF WRIGHT MEDICAL

## DESIGN DEFECT

### Ti MODULAR NECKS and the PROFEMUR HIP SYSTEM

227.    Plaintiff incorporates by reference the facts and allegations set forth in the paragraphs above of this Complaint.

228.    Defendant Wright Medical had a duty to place into the stream of commerce, design, manufacture, import, distribute, market, promote and sell the Profemur Hip System in general, and specifically the Ti Profemur® Modular Neck (the "device"), so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed, and sold.

229.    Prior to 2004 Defendant Wright Medical was engaged in the business of designing, manufacturing, importing, marketing, distributing, and selling orthopedic hip implants and did design, manufacture, import, distribute, market, and sell the Wright Medical Profemur Hip System, and the Wright Medical Ti Profemur® Modular Neck.

230.    Defendant Wright Medical did in fact design, manufacture, market, sell, distribute, supply and/or promote the Wright Medical Profemur Hip System, and the Wright Medical Ti Profemur® Modular Neck to Plaintiff Gabriel C. Fuentes, Scottsdale Healthcare Shea Medical Center, and/or Plaintiff's surgeon.

231.    Defendant Wright Medical expected the Wright Medical Profemur Hip System, and the Wright Medical Ti Profemur® Modular Neck, they were importing, selling, distributing,

marketing, supplying, designing, manufacturing and/or promoting to reach, and which did in fact

reach, hospitals, implanting physicians, and consumers in the state of Arizona, including Plaintiff

Gabriel C. Fuentes, Scottsdale Healthcare Shea Medical Center, and/or Plaintiff's surgeon

Theodore P. Firestone, M.D., without substantial change in its condition.

232.    At the time the Wright Medical Profemur Hip System, and the Wright Medical Ti

Profemur® Modular Neck, left the possession of Defendant Wright Medical and the time the device

entered the stream of commerce, it was in an unreasonably dangerous or defective condition.

These defects include, but are not limited to, the following:

    a.    the device was not reasonably safe as intended to be used;

    b.    the device had an inadequate design for the purpose of hip replacement in
          the population it was intended to be used in and was marketed to;

    c.    the device contained unreasonably dangerous design defects, including an
          inherently unstable and defective design, i.e., use of titanium alloys in the
          modular neck, which resulted in an unreasonably high probability of
          structural failure;

    d.    the device's defective design resulted in a hip prosthesis that had risks
          which exceeded the utility of the medical device;

    e.    the device was unreasonably dangerous to an extent beyond which would
          be contemplated by the ordinary consumer;

    f.    a reasonably prudent manufacturer, distributor, or seller, given knowledge
          of the device's condition, would not have marketed, distributed, or sold the
          device;

g.      the device was not appropriately or adequately tested before its distribution

or sale; and,

h.      the device has an unreasonably high propensity for corrosion, fretting and

fatigue failure under normal, intended, and expected use.

233.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Wright Medical Profemur Hip System, and the Wright Medical Ti Profemur® Modular Neck, feasible, alternative safer designs for the device were known and available to Wright Medical, including, but not limited to, designs that utilized manufacturing and finishing processes that would make the Ti modular neck stronger in this application, less susceptible to fretting and corrosion, and less likely to suffer a structural failure from fatigue than the design and processes that were in fact used by Wright Medical.

234.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Wright Medical Profemur Hip System, and the Wright Medical Ti Profemur® Modular Neck, feasible, alternative safer designs for the device were known and available to Wright Medical, including, but not limited to, designs that utilized a cobalt-chromium alloy rather than a titanium alloy for the modular neck that would make the modular neck stronger in this application, less susceptible to fretting and corrosion, and less likely to suffer a structural failure from fatigue.

235.    Had Defendant Wright Medical properly and adequately tested the device, it would have discovered that over time the Ti modular neck it designed would not withstand the stress it was expected to be subjected to in the ordinary and expected use of the device in a significant number of patients that it was intended to be used in, and marketed to be used in, and was certain

to structurally fail in numbers and at rates significantly higher than expected, and was certain to structurally fail in numbers and at rates significantly higher than other available alternative devices.

236.    Defendant Wright Medical's Ti Profemur® Modular Necks were, therefore, defective in design in that, when they left the hands of Defendant Wright Medical, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the device's design, and/or it was dangerous to an extent beyond which would be contemplated by the ordinary user or consumer.

237.    The foreseeable risks associated with the design of the Ti Profemur® Modular Neck devices include, but are not limited to, the fact that the design of the devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

238.    Plaintiff Gabriel C. Fuentes' Wright Medical artificial hip with the Ti Profemur® modular neck was unreasonably dangerous in that the risks of danger in the design of the Ti Profemur® modular neck outweighed the benefits of that design, including, but not limited to the following:

        a.    There were other safer products available to meet the same need;

        b.    The likelihood of injury and its seriousness were substantially higher than other available alternative designs and devices;

        c.    Common knowledge and normal public expectations would not have included knowledge of high the risks associated with this device compared to other available designs and devices;

d.    The risk of injury was not avoidable if using the product as promoted and advertised by the manufacturer and distributor;

e.    The warnings did not adequately warn of the increased risks associated with this device compared to other available designs and devices; and

f.    The risks could have been substantially reduced, if not eliminated, without impairing the usefulness of the product or making it unduly expensive.

239.    At the time the Wright Medical Profemur® hip system, and the Wright Medical Ti Profemur® modular neck, left the possession of Defendant Wright Medical and the time the device entered the stream of commerce, it was in an unreasonably dangerous or defective condition. These defects include, but are not limited to, the following:

a.    The device was not reasonably safe as intended to be used;

b.    The device had an inadequate design for the purpose of hip replacement in the population it was intended to be used in and was marketed to;

c.    The device contained unreasonably dangerous design defects, including an inherently unstable and defective design, i.e., use of titanium alloys in the modular neck, which resulted in an unreasonably high probability of structural failure;

d.    The device's defective design resulted in a hip prosthesis that had risks which exceeded the utility of the medical device;

e.    The device was dangerous to an extent beyond which would be contemplated by the ordinary consumer;

  f.  A reasonably prudent manufacturer, distributor, or seller, given knowledge of the device's condition, would not have marketed, distributed, or sold the device;

  g.  The device was not appropriately or adequately tested before its distribution or sale; and

  h.  The device has an unreasonably high propensity for corrosion, fretting and fatigue failure under normal, intended, and expected use.

240. The conduct of Defendant Wright Medical, as set forth above, rendered the Wright Medical Ti Profemur® Modular Neck unreasonably dangerous.

241. As a direct and proximate result of the conduct of Defendant Wright Medical, Plaintiff Gabriel C. Fuentes sustained injuries and damages as set forth in this Complaint.

## COUNT II

### STRICT LIABILITY OF WRIGHT MEDICAL

### MARKETING DEFECT: FAILURE TO WARN

### Ti MODULAR NECKS and the PROFEMUR HIP SYSTEM

242. Plaintiff incorporates by reference the facts and allegations set forth above in this Complaint.

243. At all times relevant herein, Defendant Wright Medical was engaged in the design, development, testing, manufacturing, importing, marketing. and sale of the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically.

244. Defendant Wright Medical designed, manufactured, imported, marketed, distributed, and sold the Profemur Hip System devices in general, and the Ti Profemur® Modular

Neck specifically, to hospitals, to surgeons, and to potential patients knowing that they would then be implanted in patients in need of hip prosthesis with a wide variety of ages, height, body weight, activity levels, and lifestyles.

245.   Defendant Wright Medical distributed and sold the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, in a condition when they left their place of manufacture, in their original form of manufacture, which included the defects described herein.

246.   The Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, were expected to and did reach Plaintiff Gabriel C. Fuentes and his implanting surgeon, Theodore P. Firestone, M.D., without substantial change in their condition as manufactured and sold by Defendant Wright Medical.

247.   Defendant Wright Medical's Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, were designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendant Wright Medical in an unreasonably dangerous and defective condition and posed a threat to most any and all users or consumers of these devices; failing to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

248.   At all times relevant herein, Plaintiff Gabriel C. Fuentes was a person who Defendant Wright Medical should have considered to be subjected to the harm caused by the defective nature of the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically.

249.    Defendant Wright Medical's Profemur Hip System devices, including the Ti Profemur® Modular Neck, were implanted, and used in the manner for which they were intended.

250.    Defendant Wright Medical knew or should have known through testing, adverse event reporting or otherwise, that their Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, created a substantially higher risk of bodily injury and serious harm, from structural failure of the Ti modular neck component by fatigue failure, than other available hip stem devices.

251.    Defendant Wright Medical had a duty to warn their sales representatives/ distributors, purchasing hospitals, implanting surgeons such as Theodore P. Firestone, M.D., and patients including Plaintiff Gabriel C. Fuentes, of this substantially higher risk of bodily injury and serious harm, from structural failure of the Ti modular neck component by fatigue failure.

252.    Defendant Wright Medical breached their duty in that they failed to provide adequate and timely warnings or instructions regarding their Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, and their known defects.

253.    Defendant Wright Medical furthermore, breached their duty to warn at pre-surgery and/or post-surgery by (a) failing to adequately communicate the warning to their sales representatives/distributors, purchasing hospitals, surgeons, and/or to the ultimate users, patients such as Plaintiff Gabriel C. Fuentes; and/or (b) by failing to provide adequate warning of the risk of sudden catastrophic structural failure of the Ti Profemur® Modular Neck.

254.    Adequate efforts to communicate a warning to the ultimate users were not made by Defendant Wright Medical and, to the extent a warning was communicated by Defendant Wright

Medical, the warning was inadequate, all of which Defendant Wright Medical was strictly liable for.

255.   The warnings, pre-surgery and/or post-surgery, to Plaintiff Gabriel C. Fuentes and his implanting surgeon about the dangers the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, posed to consumers were inadequate.   Examples of Defendant Wright Medical's negligence in the lack and/or inadequacy of its warnings include, but are not limited to, one or more of the following particulars:

       a.     The device contained warnings insufficient to alert Plaintiff Gabriel C. Fuentes and Plaintiff's surgeon as to the reduced fatigue strength of the stem and neck, as well as to the risk of adverse events, i.e., neck fractures, associated with the Ti Profemur® Modular Neck, subjecting Plaintiff Gabriel C. Fuentes to risks which exceeded the benefits of the device;

       b.     the device contained misleading warnings emphasizing the efficacy of the device while downplaying the risks associated with it, thereby making use of the device more dangerous than the ordinary consumer would expect;

       c.     the device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff Gabriel C. Fuentes, through their prescribing physicians regarding the risk, scope, propensity, frequency, duration, and severity of the catastrophic structural failures associated with the Ti Profemur® Modular Neck;

       d.     the device did not disclose that it was inadequately tested;

e.      the device failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the device;

f.      the device failed to contain instructions sufficient to alert consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers;

g.      the device's warning against use in "obese" and/or active patients was insufficient and inadequate;

h.      the device's warnings, such as they were, regarding the use of these devices in patients engaged in active lifestyles, high impact activities, were insufficient and inadequate;

i.      the device's warnings, such as they were, regarding the use of these devices in heavier patients, were insufficient and inadequate; and,

j.      the device failed to communicate or failed to adequately communicate the events and conditions known to Wright Medical, set forth elsewhere above, incorporated herein by reference.

256.    Plaintiff Gabriel C. Fuentes used the Wright Medical Profemur Hip System in general, and the Wright Medical Ti Profemur® Modular Neck:

a.      For its intended purpose;

b.      For purposes demonstrated and represented by Wright Medical in its printed marketing and informational materials;

c.      For purposes demonstrated and represented by Wright Medical in its "Patient Stories" and "Patient Testimonials" that appeared in its web site;

d.      For purposes demonstrated and represented by Wright Medical in webinars intended for surgeons that Wright sponsored and that appeared in its website;

e.      For the lifestyle and purposes demonstrated and represented by Wright Medical and Jimmy Connors in the www.Jimmysnewhip.com website created by Wright Medical;

f.      For the lifestyle and purposes demonstrated and represented by Wright Medical and in a "webinar" intended for viewing by orthopedic surgeons created by Wright Medical that featured Lowry Barnes, M.D., and Brad Penenberg, M.D.; and,

g.      To return to the "active lifestyle" that Wright represented on its web site.

257.    Plaintiff Gabriel C. Fuentes could not have discovered any defect in the device through the exercise of reasonable diligence or due care.

258.    Defendant Wright Medical, as the designer, manufacturer, importer, marketer, and distributor of medical devices are held to the level of knowledge of an expert in their field.

259.    Plaintiff Gabriel C. Fuentes and his implanting surgeon did not have substantially the same knowledge about the device as Defendant Wright Medical who was the designer, manufacturer, importer, and/or distributor of the device.

260.    Defendant Wright Medical should have known if its device was unsuited for active individuals such as Plaintiff Gabriel C. Fuentes, and expressly so stated in its instructional,

marketing, and informational materials it published in paper, on the internet, in its IFU's, and in the information it provided to its sales force and distributors.

261.    Theodore P. Firestone, M.D., a surgeon who implanted these devices, as the "learned intermediary" for the patient, here Plaintiff Gabriel C. Fuentes, had a right to know that:

    a.    The claim made in printed materials that have been distributed claiming that, "None of the necks has experienced a clinical failure since their inception" was not true;

    b.    Defendant Wright Medical had received notice of several clinical failures of Ti Profemur® modular necks in the form of the structural failure of the modular neck by it suddenly and without warning catastrophically fracturing, before this device was chosen by the surgeon for implantation in Plaintiff;

    c.    Defendant Wright Medical had received notice of several clinical failures of Ti Profemur® modular necks in the form of the structural failure of the modular neck suddenly and without warning catastrophically failing due to a fatigue failure of the oblong taper in the pocket of the Profemur® stem;

    d.    The "guarantee" of structural reliability was in fact not a guarantee, and that these devices were known to be catastrophically structurally failing from fatigue failures after implantation;

    e.    The "guarantee" against significant micromotion was in fact not a guarantee and that significant micromotion was known to have occurred and was continuing to occur with these devices after implantation;

f.  The "guarantee" against fretting corrosion was in fact not a guarantee and that fretting corrosion was known to have occurred and was continuing to occur with these devices after implantation;

g.  Gabriel C. Fuentes was not an appropriate candidate for implantation of a Wright Medical Profemur® modular hip because of his bodyweight;

h.  Gabriel C. Fuentes was not an appropriate candidate for implantation of a Wright Medical Profemur® modular hip because of his activity level;

i.  Gabriel C. Fuentes was not an appropriate candidate for implantation of a Wright Medical Profemur® modular hip because of his lifestyle;

j.  That coupling a titanium Wright Medical titanium Profemur® modular neck with a Profemur® Plasma Z Stem would increase the risk of subsequent fracture of the Profemur® modular neck;

k.  That Wright Medical titanium Profemur® modular necks were not cleared by the FDA to be implanted with a with a Profemur® Plasma Z Stem; and,

l.  That Wright Medical Profemur® Plasma Z Stems did not have an FDA 510(k) clearance.

262.  Theodore P. Firestone, M.D., a surgeon who implanted these devices, as the "learned intermediary" for the patient, here Plaintiff Gabriel C. Fuentes, had a right to know that, contrary to the claims made in writing by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," fractures of Wright Medical Ti Profemur® Modular Necks had in fact occurred, so that he could consider that information in deciding whether or not to choose this device for implantation in Plaintiff, Gabriel C. Fuentes.

263.    The conduct of Defendant Wright Medical, as set forth above, rendered the Wright Medical Ti Profemur® Modular Neck unreasonably dangerous for use in a reasonably foreseeable manner without adequate warnings or instructions.

264.    As a direct and proximate result of the conduct of Defendant Wright Medical, Plaintiff Gabriel C. Fuentes sustained injuries and damages as set forth in this Complaint.

**COUNT III**

**NEGLIGENCE OF WRIGHT MEDICAL**

**Ti MODULAR NECKS and the PROFEMUR HIP SYSTEM**

265.    Plaintiff incorporates by reference the facts and allegations set forth above in this Complaint.

266.    Defendant Wright Medical had a duty to exercise reasonable care in the design, manufacture, testing, quality assurance, quality control, labeling, warning, marketing, promotion, importation, sale and distribution of the Profemur® Total Hip System in general, and the Ti Profemur® modular neck in particular, so that the product can be safely used as intended by the consumers such as Plaintiff, and duty to warn consumers such as Plaintiff of a dangerous condition of its Profemur® Total Hip System with the Ti Profemur® modular neck.

267.    Surgeons who implanted these devices, as the "learned intermediary" for the patient, here Plaintiff Gabriel C. Fuentes, had a right to know, and Wright Medical Negligently failed to disclose to surgeons:

> a.    The claim made in printed materials that have been distributed claiming that, "None of the necks has experienced a clinical failure since their inception" was not true;

b.      Defendant Wright Medical had received notice of several clinical failures
        of Ti Profemur® modular necks in the form of the structural failure of the
        modular neck by it suddenly and without warning catastrophically
        fracturing, before this device was chosen by the surgeon for implantation in
        the Gabriel C. Fuentes;

c.      Defendant Wright Medical had received notice of several clinical failures
        of Ti Profemur® modular necks in the form of the structural failure of the
        modular neck suddenly and without warning catastrophically failing due to
        a fatigue failure of the oblong taper in the pocket of the Profemur® stem;

d.      The "guarantee" of structural reliability was in fact not a guarantee, and that
        these devices were known to be catastrophically structurally failing from
        fatigue failures after implantation;

e.      The "guarantee" against significant micromotion was in fact not a guarantee
        and that significant micromotion was known to have occurred and was
        continuing to occur with these devices after implantation;

f.      The "guarantee" against fretting corrosion was in fact not a guarantee and
        that fretting corrosion was known to have occurred and was continuing to
        occur with these devices after implantation;

g.      Gabriel C. Fuentes was not an appropriate candidate for implantation of a
        Wright Medical Profemur® modular hip because of his bodyweight;

h.      Gabriel C. Fuentes was not an appropriate candidate for implantation of a
        Wright Medical Profemur® modular hip because of his activity level;

i.     Gabriel C. Fuentes was not an appropriate candidate for implantation of a Wright Medical Profemur® modular hip because of his lifestyle;

j.     That coupling a titanium Wright Medical titanium Profemur® modular neck with a Profemur® Plasma Z Stem would increase the risk of subsequent fracture of the Profemur® modular neck;

k.     That Wright Medical titanium Profemur® modular necks were not cleared by the FDA to be implanted with a with a Profemur® Plasma Z Stem; and,

l.     That Wright Medical Profemur® Plasma Z Stems did not have an FDA 510(k) clearance.

268.    Defendant Wright Medical, by the herein mentioned conduct, acts and omissions, breached their duty of care by, among other things, failing to exercise ordinary and reasonable care in the design, manufacture, labeling, promotion, marketing, sale, testing, quality assurance, quality control, distribution, and post-sale warning of Plaintiff Gabriel C. Fuentes' Wright Medical artificial hip with the Ti Profemur® modular neck.

269.    Defendant Wright Medical additionally failed to exercise ordinary care and were negligent in testing and failing to adequately test the Ti Profemur® modular necks prior to their marketing, importation, sale and/or distribution.

270.    Defendant Wright Medical tested their Ti Profemur® modular necks for fatigue failure of the neck at the oblong taper at a weight that represented twice the body weight of a 250-pound individual, or two and one-half times the body weight of a 200-pound individual. Yet, published scientific literature available prior to December 13, 2000, stated that routine activities such as walking may impose up to five times a person's body weight on a person's hip joint, and

61

more strenuous but common and expected activities may impose four to eight times a person's body weight on the hip joint.

271.    Had Defendant Wright Medical adequately tested the Ti modular neck stem junction of their Profemur® hip system, they would have discovered that the neck was certain not to withstand over time without fracture the forces that it would be subjected to in the ordinary activities of some patients that these devices were reasonably expected to be implanted in.

272.    Defendant Wright Medical were negligent in failing specifically to warn implanting surgeons, such as Dr. Penenberg, that the Ti Profemur® modular neck should not be used for patients weighing over 220 pounds or active patients.

273.    Defendant Wright Medical were negligent in failing to warn Gabriel C. Fuentes and Dr. Penenberg, that after the hip replacement that there was a risk the titanium necks in the implanted hip systems would fracture from metal fatigue during normal and expected use that was higher than the risk of fracture at the femoral neck of other artificial hip stems that did not use a Ti modular neck with a neck-stem joint at a similar location.

274.    Defendant Wright Medical were negligent in their choice of the titanium alloy (Ti6Al4V) for the modular neck rather than choosing a cobalt-chromium alloy, similar to that used in their femoral heads, and the neck that was a part of those heads.

275.    Defendant Wright Medical were negligent in not employing manufacturing techniques, and surface treatments to the titanium alloy (Ti6Al4V) used in the modular neck that would have increased it resistance to fretting corrosion and reduced its risk of fracture from metal fatigue caused by cyclic loading.

276.    Defendant Wright Medical knew or had reason to know that Gabriel C. Fuentes, as a member of the general public for whose use the device was placed into interstate commerce, would be likely to use the device in a manner described in this Complaint.

277.    Defendant Wright Medical knew or reasonably should have known of the danger associated with the manner and circumstances of Gabriel C. Fuentes' foreseeable use of the device, which dangers would not be obvious to the general public.

278.    Despite the fact that Defendant Wright Medical knew or should have known that the Profemur® hip system in general, and the Ti Profemur® modular neck specifically, posed a serious risk of bodily harm to consumers, said Defendant negligently continued to manufacture and market these devices for use by consumers.

279.    Defendant Wright Medical knew or should have known that consumers such as Gabriel C. Fuentes would foreseeably suffer injury as a result of their negligence and failure to exercise ordinary care as described above, including the failure to comply with applicable federal requirements as to reporting and labeling.

280.    Defendant Wright Medical's conduct, as described above and throughout this Complaint, including, but not limited to, their failure to adequately test, failure to warn, as well as their continued marketing and distribution of the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, when they knew or should have known of the serious health risks these devices created and/or the failure to comply with federal reporting and labeling requirements, was and is negligent.

281.    Defendant Wright Medical should have known that their Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, failed to comply with federal

requirements for safe design, manufacture, warning, and labeling, yet it negligently misrepresented to Gabriel C. Fuentes, and/or his surgeon, that their Profemur® hip system in general, and the Ti Profemur® modular neck specifically, was safe and met all applicable design, manufacturing, and warning requirements.

282.    Defendant Wright Medical made false representations and material omissions in their marketing, advertisements, promotions, and labeling concerning these products for use in patients such as Gabriel C. Fuentes, and said Defendant had a pecuniary interest in making these representations and omissions.

283.    Defendant Wright Medical, furthermore, in advertising, marketing, packaging, importing, distributing, and selling the Ti Profemur® modular neck negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion.

284.    Defendant Wright Medical, in advertising, marketing, packaging, labeling, importing, distributing, and/or selling the Profemur® hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the Profemur® hip using the Ti Profemur® modular neck had been adequately and reliably tested when, in fact, it had not.

285.    Defendant Wright Medical, in advertising, marketing, packaging, labeling, importing, distributing, and/or selling the Profemur® hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the risk of serious

adverse events and/or effects from the Profemur® hip using the Ti Profemur® modular neck was comparable to that of other hip replacement systems when, in fact, it was not.

286.   Defendant Wright Medical, in advertising, marketing, packaging, labeling, importing, distributing, and/or selling the Profemur® hip, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur® hip using the Ti Profemur® modular neck had never experienced a clinical failure, when in fact it had experienced several clinical failures by fracture of the modular neck.

287.   Defendant Wright Medical, as manufacturers, importers, distributors, and/or sellers of medical devices for implantation, owed a duty of care to see that they communicated truthful information to Gabriel C. Fuentes, and his surgeon as the learned intermediary, but negligently breached that duty by failing to exercise due care in their representations and omissions regarding the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically.

288.   Plaintiff Gabriel C. Fuentes, and/or his surgeon as the learned intermediary, justifiably relied upon Defendant Wright Medical's misrepresentation and omissions in their marketing, advertisements, promotions, and labeling concerning these products, including defendants' representations that the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, were safe for use in persons such as Gabriel C. Fuentes.

289.   As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, Gabriel C. Fuentes made the conscious and affirmative decision to proceed with hip replacement surgery with the Wright Medical Profemur® hip.

290.   As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, Dr. Penenberg used the Profemur® hip system devices in general, and the Ti Profemur® modular neck specifically, in Gabriel C. Fuentes.

291.   Defendant Wright Medical's conduct, as described above and throughout this Complaint, including, but not limited to, Defendant Wright Medical's inadequate design, failure to adequately test, failure to warn, misrepresentations, and false statements, as well as their continued marketing and distribution of the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, when they knew or should have known of the serious health risks these devices created and/or the failure to comply with federal reporting and labeling requirements, was negligent.

292.   As a direct and proximate result of the conduct of Defendant Wright Medical, Plaintiff Gabriel C. Fuentes sustained injuries and damages set forth in this Complaint.

## COUNT IV

### NEGLIGENT MISREPRESENTATION BY WRIGHT MEDICAL

### Ti MODULAR NECKS and the PROFEMUR HIP SYSTEM

293.   Plaintiff incorporates by reference the facts and allegations set forth above in this Complaint.

294.   Wright Medical created documents known as "Technical Monographs" that were intended to provide information about its Profemur Hip System to its distributors, sales representatives, and to surgeons.

295.    In some of the Technical Monographs it created Wright Medical made the following representations, statements, and claims about its Profemur® Modular Necks:

> The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip. None of the necks has experienced a clinical failure since their inception.

(e.g., see: Wright Medical Technical Monograph MH688-102 © 2002, and MH688-102, REV 1204 © 2004.)

296.    Representatives of Wright Medical orally made statements and provided information to surgeons, including Plaintiff's surgeon Theodore P. Firestone, M.D., that were substantially similar to the information contained in the above quoted Technical Monographs.

297.    Plaintiff's surgeon, Theodore P. Firestone, M.D., relied upon the representations of Wright Medical contained in the above referenced Technical Monographs [e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004], quoted in paragraphs 66 and 76, above, or substantial statements contained similar publications, as well as substantially similar statements that were made to him by Wright Medical employees and officers, including, but not limited to, Patrick Fisher and the company President and CEO, Gary Henley, in deciding to use the Wright Medical Profemur Hip System in Plaintiff.

298.    At the time Wright Medical made the statement quoted above in a brochure it published in the year 2002, the statement, "None of the necks has experienced a clinical failure since their inception," was false.

299.    At the time Wright Medical made the statement referenced in above in a brochure it published in the year 2004, the statement, "None of the necks has experienced a clinical failure since their inception," was false.

300.    Wright Medical made the following guarantees, representations, statements, and claims about its Profemur® Modular Necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent #4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests has [sic] proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

(e.g., see: Wright Medical Technical Monograph MH688-102 © 2002, and MH688-102, REV 1204 © 2004.)

301.    Representatives of Wright Medical orally made statements and provided information to surgeons, including Plaintiff's surgeon Theodore P. Firestone, M.D., that were substantially similar to the information contained in the above quoted Technical Monographs.

302.    Plaintiff's surgeon, Theodore P. Firestone, M.D., relied upon the representations of Wright Medical contained in the above referenced Technical Monographs, or substantial statements contained similar publications, as well as substantially similar statements that were made to him by Wright Medical employees and officers, including, but not limited to, Patrick Fisher and the company President and CEO, Gary Henley, in deciding to use the Wright Medical Profemur Hip System in the Plaintiff.

303.    At the time Wright Medical made the statement quoted above in a brochure published in the year 2002, that statement was false.

304.    At the time Wright Medical made the statement referenced above in a brochure it published in December of 2004, that statement was false.

305.    At the time Wright Medical made the above quoted statements in writing, or orally by Wright Medical employees or offices, to Plaintiff's surgeon Theodore P. Firestone, M.D., those statements were false.

306.    Plaintiff's surgeon Theodore P. Firestone, M.D., not knowing the above referenced statements were false, relied on those statements in deciding to use the Wright Medical Profemur Hip System in Plaintiff.

307.    At the time Wright Medical marketed, promoted, imported, sold and/or distributed the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, they knew that these devices were intended for human use, and Plaintiff Gabriel C. Fuentes was a foreseeable user of this product.

308.    Wright Medical made representations to surgeons, including Plaintiff's surgeon, Theodore P. Firestone, M.D., that its Profemur Hip System, mated with a Conserve Cup and Conserve femoral head, would last 20 to 30 years.

309.    The representations, statements, and claims made by Defendant Wright Medical were a part of the basis for Plaintiff's surgeon's decision to use of the product, and he relied on these express representations, statements, and claims in deciding to use the product in Plaintiff Gabriel C. Fuentes.

310.    Plaintiff Gabriel C. Fuentes' surgeon, Theodore P. Firestone, M.D., as the learned intermediary, reasonably relied upon Defendant Wright Medical's, representations, statements, and claims.

311.    The Ti Profemur® Modular Neck did not conform to Defendant Wright Medical's guarantees, representations, statements, and claims because there had been clinical failures of the modular necks by fracture of the neck before the device was sold or distributed for implantation in Plaintiff.

312.    The Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, did not conform to Defendant Wright Medical's guarantees, representations, statements, and claims because the Ti Profemur® Modular Neck structurally failed and caused serious injury to Plaintiff Gabriel C. Fuentes when used as recommended and directed.

313.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, importing, distributing, and selling the Ti Profemur® Modular Neck negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion.

314.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the Profemur hip using the Ti Profemur® Modular Neck had been adequately and reliably tested when, in fact, it had not.

315.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the risk of serious

adverse events and/or effects from the Profemur hip using the Ti Profemur® Modular Neck was comparable to that of other hip replacement systems when, in fact, it was not.

316.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur hip using the Ti Profemur® Modular Neck had not caused or contributed to serious adverse events and/or effects requiring the premature explants of the device when, in fact, it had.

317.    Defendant Wright Medical, as designers, manufacturers, importers, marketers, distributors, and sellers of medical devices for implantation, owed a duty of care to see that they communicated truthful information to Plaintiff Gabriel C. Fuentes' surgeon, but negligently breached that duty by failing to exercise due care in their representations and omissions regarding the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically.

318.    Plaintiff Gabriel C. Fuentes' surgeon justifiably relied upon Defendant Wright Medical's misrepresentation and omissions in their marketing, advertisements, promotions, and labeling concerning these products, including Defendant Wright Medical's representations that the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, were safe for use in persons such as Plaintiff Gabriel C. Fuentes.

319.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, Plaintiff's surgeon Theodore P. Firestone, M.D., used the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, in Plaintiff Gabriel C. Fuentes.

320.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur hip using the Ti Profemur® Modular Neck had never experienced a clinical failure, when in fact it had experienced several clinical failures by fracture of the modular neck.

321.    Defendant Wright Medical, as designers, manufacturers, importers, marketers, distributors, and sellers of medical devices for implantation, owed a duty of care to see that they communicated truthful information to Plaintiff Gabriel C. Fuentes, and his surgeon as the learned intermediary, but negligently breached that duty by failing to exercise due care in their representations and omissions regarding the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically.

322.    Plaintiff Gabriel C. Fuentes, and/or his surgeon as the learned intermediary, justifiably relied upon Defendant Wright Medical's misrepresentation and omissions in their marketing, advertisements, promotions, and labeling concerning these products, including Defendant Wright Medical's representations that the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, were safe for use in persons such as Plaintiff Gabriel C. Fuentes.

323.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, Plaintiff's surgeon Theodore P. Firestone, M.D., used the Profemur Hip System devices in general, and the Ti Profemur® Modular Neck specifically, in Plaintiff Gabriel C. Fuentes.

**PUNITIVE DAMAGES**

324.      Plaintiff incorporates by reference the factual background set forth above in this Complaint.

325.      The acts of Defendant Wright Medical were attended by circumstances demonstrating that it acted maliciously, and with an intentional disregard of the rights of Plaintiff Gabriel C. Fuentes.  This conduct included, but was not limited to:

      a.      Designing, manufacturing, exporting, importing, distributing, marketing, and selling for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities of daily living;

      b.      Designing, manufacturing, exporting, importing, distributing, marketing, and selling for human implantation an artificial hip that was not manufactured to withstand the forces that it would be subjected to in the activities of daily living;

      c.      Designing, manufacturing, exporting, importing, distributing, marketing, and selling for human implantation an artificial hip that was not tested to withstand the level of the loads and forces it would be subjected to in the activities of daily living;

      d.      Designing, manufacturing, exporting, importing, distributing, marketing, and selling for human implantation an artificial hip that was not designed to withstand the activities and forces that it was marketed and promoted to be able to be subjected to;

e.    Once fractures of modular necks from metal fatigue were known to be occurring, not ceasing to export, import, distribute, market, and sell for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities of daily living;

f.    Once fractures of modular necks from metal fatigue were known to be occurring, not ceasing to export, import, distribute, market, and sell for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities that Wright Medical promoted this device as being appropriate for;

g.    Once fractures of modular necks from metal fatigue were known to be occurring, not informing patients that such events were occurring, and why they were occurring, so that the recipients of these devices may take such steps as were necessary to adjust their activities, or protect themselves so as to minimize the risk that their device would fail;

h.    Once fractures of modular necks from metal fatigue were known to be occurring, not informing surgeons who had implanted these devices that such events were occurring, and why they were occurring, and the numbers and rates at which they are occurring, so they would know to inform their patients and advise them to take such steps as were necessary to adjust their activities, or protect themselves so as to minimize the risk that their device would fail;

i.    Once fractures of modular necks from metal fatigue were known to be occurring, misleading Wright Medical customers with a letter as to the number and frequency of modular neck fractures that were known to be occurring, and misstating the level, degree, and description of those who were now known by Wright Medical to be at an increased risk of suffering a modular neck fracture;

j.    Once it became clear that Ti Profemur® Modular Necks fractures were occurring in significant numbers to patients other than "heavy-weight males, long modular necks, and patient activities such as heavy lifting and impact sports," not informing surgeons who had implanted these devices that such events were occurring, why they were occurring, and the numbers and rates at which they are occurring;

k.    Once it became clear that Ti Profemur® Modular Necks fractures were occurring in significant numbers to patients other than "heavy-weight males, long modular necks, and patient activities such as heavy lifting and impact sports," not informing surgeons who had implanted these devices that such events were occurring, why they were occurring, and the numbers and rates at which they are occurring, so surgeons who had implanted these devices could make informed decisions as to how to inform their patients and advise them to take such steps as were necessary to adjust their activities, or protect themselves so as to minimize the risk that their device would fail; and,

l.      Placing continued revenue and profits from the sale of these devices above the concern for patient safety.

326.    The malicious conduct of Defendant Wright Medical was conduct purposefully committed which Defendant Wright Medical must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Gabriel C. Fuentes.

327.    Defendant Wright Medical, when it had the opportunity to do so, repeatedly failed to correct a known unreasonably dangerous condition regarding their medical device at issue, the Profemur Hip System devices in general, and specifically the Ti Profemur® Modular Neck.

## DAMAGES FOR ALL CAUSES OF ACTION

328.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

329.    For his damages for each cause of action Plaintiff further alleges that as a direct and proximate result of the failure of the Wright Medical Profemur® Hip System with the Ti Profemur® Modular Neck, and the conduct, actions, inactions and omissions of Defendant Wright Medical Technology, Inc., Plaintiff Gabriel C. Fuentes has sustained injuries and damages including, but not limited to:

a.      Serious and permanent physical injuries to bone, muscle, tendons, tissues and nerves in his hip and pelvis;

b.      Undergoing surgery to remove and replace the failed components and repair the damage that failure caused;

c.      Past and future pain, suffering, and anguish, both in mind and in body;

     d.       Physical disability, past and future;

     e.       Permanent physical impairment;

     f.       Disfigurement;

     g.       Loss of enjoyment of life;

     h.       Medical bills associated with the revision surgeries, therapy, and rehabilitation, and recovery there from in an amount of at least $75,000;

     i.       Future medical bills and expenses;

     j.       Loss of past and future income and earning capacity, past and future; and,

     k.       Attorney fees and the costs and expenses of litigation as may be permitted by statute.

330.    As a result of the conduct of Defendant Wright Medical Technology, Inc., as set forth above, who acted maliciously in conscious disregard of Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gabriel C. Fuentes prays for judgment in his favor and an award of damages against Defendant Wright Medical Technology, Inc., as follows:

     a.       Special damages, including past medical bills and expenses in excess of $75,000, in an amount as may be proven at trial;

     b.       Future medical and incidental expenses, according to proof;

     c.       Past and future loss of earnings and/or earning capacity, according to proof;

     d.       Past and future general damages, to include pain and suffering, severe emotional distress, and mental anguish, according to proof;

e.      Pre-judgment and post-judgment interest;

f.      The awardable court costs of this action;

g.      Reasonable attorneys' fees as may be allowed by law;

h.      Punitive damages; and,

i.      For any and all such other and further legal and equitable relief as the Court
        deems necessary, just, equitable and proper.

Plaintiff Gabriel C. Fuentes further and additionally prays for judgment in his favor and an award of punitive damages in an amount to be determined at trial against Defendant Wright Medical Technology, Inc.

## DEMAND FOR JURY TRIAL

Plaintiff Gabriel C. Fuentes respectfully demands a trial by jury pursuant to the Seventh Amendment to the United States Constitution and Fed. R. Civ. P. 38(a) and (b).

Respectfully submitted this 20th day of January 2022.

George E. McLaughlin, Colorado Bar No. 16364
McLaughlin Law Firm, P.C.
1890 Gaylord Street
Denver, CO 80206-1211
Telephone: 720-420-9800
GEM@MCLLF.com
*Attorney for Plaintiff*